UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MOLLY JOHNSTON,

                            Plaintiff

                                                                    DECISION AND ORDER

-vs-

                                                                      04-CV-6486 CJS

JO ANNE B. BARNHART,
Commissioner of Social Security,

                            Defendant.
_____

APPEARANCES

For the Plaintiff:                William J. McDonald, Jr., Esq.
                                     Bond and McDonald, P.C.
                                     91 Genesee Street
                                     Geneva, New York 14456

For the Defendant:            Michael A. Battle, Esq.
                                     United States Attorney for the
                                     Western District of New York
                                     Christopher V. Taffe, Esq.
                                     Assistant United States Attorney
                                     100 State Street
                                     Rochester, New York 14614

INTRODUCTION

      This is an action brought pursuant to 42 U.S.C. § 405(g) to review the final determination of the Commissioner of Social Security ("Commissioner"), which denied plaintiff's application for disability insurance benefits. Now before the Court is plaintiff's motion for judgment on the pleadings [#3] and defendant's cross-motion for the same relief [#5]. For the reasons stated below, the Commissioner's decision is reversed and this matter is remanded for a new hearing.

FACTUAL BACKGROUND

Plaintiff was born on June 26, 1959.  Her formal education consisted of high school and three years of college.  Plaintiff began working in 1977 and worked consistently until 2002. (63, 68).[1]  Plaintiff worked as a data processor, bank teller, office manager, and account clerk.  Her longest span of employment in a single position was as an administrative assistant with Cornell Cooperative Extension for ten years, between 1987 and 1997. (81).   After that she worked as an office manager for the same employer for approximately three-and-a-half years.  During her last period of employment, between 2001 and 2002, plaintiff performed data entry for Kelly Temporary Services. (81).  Plaintiff stopped working on or about July 19, 2002 due to medical problems which the Court will discuss below.

Since she stopped working, plaintiff essentially remains at the home that she shares with her boyfriend and her teenage son.  With their assistance, she is able to go shopping and do laundry, dishes, and other household chores. (90). She takes naps in the morning and afternoon. (90).  Plaintiff is able to care for herself but needs assistance with small buttons and clasps on jewelry.  Plaintiff cooks two to three times per week, but her boyfriend does the cooking the rest of the time.  Plaintiff states that she is unable to perform cooking tasks such as peeling potatoes, or stirring biscuit mix, without assistance.  Plaintiff spends the day watching television, reading, and performing household chores on the limited basis described above.  Plaintiff states that she is not able to type on a computer keyboard or use a computer mouse for any length

---

[1]Citations are to the administrative record unless otherwise indicated.

of time, or to complete household chores without assistance. Plaintiff is able to drive a car, but not for long distances, due to pain in her arms and hands.

## MEDICAL EVIDENCE

Plaintiff began to experience pain in her upper torso and back between 1990 and 1992. (97). In or about May 2001, she began to experience pain throughout her body. (97). Plaintiff states that the pain affects various parts of her body, and describes the pain as "tingling, stabbing, constant ache or burning sensation, cramping, bloating, headaches, abdominal cramps, earaches, burning in knuckles and legs, . . . aches in lower legs, very sensitive elbows, cramps in hands." Plaintiff also complains of depression. Plaintiff has taken Celebrex, Elavil, and a variety of over-the-counter medications for pain.

In January 2001, plaintiff's primary care physician, James C. Powers, M.D. ("Powers"), diagnosed plaintiff with "musculoskeletal complaints, possible mid thoracic root syndrome secondary to her computer work station posturing," with a secondary diagnosis of fibromyalgia. On March 30, 2004, Powers noted plaintiff's "ongoing complaints of various musculoskeletal pain," and diagnosed "bilateral lateral epicondylitis" or tennis elbow.

On September 18, 2002, David Carlson, M.D. ("Carlson"), examined plaintiff in connection with a Worker's Compensation claim. At that time, plaintiff had been out of work for approximately two months due primarily to pain in her hands and arms from "excessive computer terminal entry work." Plaintiff complained of pain in hands, arms, and joints, and told Carlson that Powers had diagnosed her with fibromyalgia. Plaintiff told Carlson that she was unable to use over the counter anti-inflammatory medications

because they caused problems with her irritable bowel syndrome.  Plaintiff told Carlson that her pain level was, on a scale of one to ten, ten.  Carlson noted that plaintiff could not "perform a forceful grasp maneuver" with her right hand, and that although she was right handed, she needed to use her left hand to perform tasks such as lifting and holding a coffee cup.  Carlson found that plaintiff had a normal range of movement in both wrists and elbows, but stated that "there are some palpable trigger points and it is unclear whether these stem from the pre-existing fibromyalgia or from other repetitive overuse syndromes."  Carlson's diagnosis was as follows:

> Bilateral hand and wrist pain.  Diagnosis is at this point uncertain.  It would appear that there is a work related component . . . .  However, there is also likely a non-work related component due to the pre-existing fibromyalgia.  Her disability is, at this point from the bilateral hand and wrist pain, moderate to severe.  She is at least partially disabled with respect to her regular work as an administrative assistant/data entry specialist.

(134).

On November 13, 2002, Ramon M. Medalle, M.D. ("Medalle"), a non-treating agency physician, examined plaintiff.  Medalle reported that plaintiff was complaining of constant aching and pain, as well as chronic fatigue and malaise.  Medalle noted that plaintiff appeared to be in no acute distress, and was able to get on and off the examining table without assistance.  Medalle's exam found that plaintiff had a full range of movement and full strength in both the upper and lower extremities, no sign of trigger points, normal finger dexterity.  Medalle diagnosed fibromyalgia, probable irritable bowel syndrome, and depression, and stated that plaintiff was "mildly limited in performing sustained moderate-to-heavy exertion because of her fibromyalgia."  (141).

On December 13, 2002, Rosemary E. Pomponio, M.D. ("Pomponio") diagnosed

plaintiff with "depression, exacerbated by fibromyalgia and inability to work." Pomponio noted that plaintiff was very angry and depressed, although her intellectual functioning, attention, concentration, insight, and judgment were all normal. Pomponio further noted that plaintiff's memory was "excellent." Pomponio opined that plaintiff had "no disability due to mental functioning," but needed further evaluation for fibromyalgia and carpal tunnel syndrome. (144). Pomponio also completed an assessment of plaintiff's functional limitations, and found that she was "moderately limited" in her ability to walk, stand, sit, and climb stairs, and was "very limited" in her ability to lift, carry, push, pull, bend, and use her hands. (145).

On March 14, 2003, Robert S. Knapp, M.D. ("Knapp"), a neurologist, examined plaintiff regarding the "chief complaint of possible bilateral carpal tunnel syndrome." Knapp noted that plaintiff was taking Celebrex for "concurrent fibromyalgia." Knapp found a "mild degree" of sensory loss in both hands, but found normal strength in the hands. Knapp performed a variety of tests, and concluded that "the electro diagnostic data are currently within normal limits, and do not indicate evidence of either a cervical radiculopathy or carpal tunnel syndrome." (168).

On March 30, 2004, Powers, whom plaintiff had apparently not seen for some time, ruled out a diagnosis of inflammatory arthritis and stated that plaintiff was "cleared for any and all employment." (182).

On June 23, 2004, John C. Dickinson, M.D. ("Dickinson"), plaintiff's new primary care physician, completed a medical evaluation of plaintiff. Dickinson's diagnosis was "probable fibromyalgia." In that regard, Dickinson stated that his diagnosis was "partly by exclusion," as well as plaintiff's pattern of pain, "trigger point distribution," and the

5

affect on plaintiff's daily activities. (187).  Dickinson noted that plaintiff had the following symptoms of fibromyalgia: pain in the posterior thorax, neck pain, low back pain, widespread pain, morning stiffness, prior depression, irritable bowel syndrome, and dysmenorrhea history. (188-89).  Dickinson stated that plaintiff was unable to sit for 6 hours during an 8-hour work day, and needed to alternate between sitting and standing. More specifically, Dickinson stated that plaintiff could stand for less than one hour at a time, and for less than two hours in an 8-hour workday; could walk for 15-20 minutes at a time, and for about 90 minutes during an 8-hour work day; and could sit for about one hour at a time and for about 4 hours in an 8-hour workday.  Dickinson also reported that plaintiff could not lift ten pounds.  Finally, Dickinson stated that plaintiff should never push or pull, was limited in her ability to reach, and should never climb, stoop, crouch, kneel, or crawl. (190-91).[2]

PROCEDURAL BACKGROUND

Plaintiff filed for disability benefits on September 25, 2002.  After her applications were denied initially on January 30, 2002 (Tr. 20-26, 160-66), plaintiff requested an administrative hearing before an ALJ.  On July 26, 2004, plaintiff appeared with her counsel for a hearing before ALJ Steven Slahta.  Plaintiff testified, as did vocational expert ("VE") Julie Andrews ("Andrews").  The ALJ issued a decision denying plaintiff's claim on August 20, 2004 (12-22)  The Appeals Council denied plaintiff's request for review, and plaintiff commenced this action on October 6, 2004.  As a result the ALJ's

---

[2]As an aside, the Court notes that as to Dickinson, plaintiff testified at the hearing that she had only been seen by Dickinson on one occasion. (258-59).  However, Dickinson indicated that he had also seen plaintiff in 1999. (188, 190).

6

decision became the Commissioner's final decision.

## STANDARDS OF LAW

42 U.S.C. § 405(g) states, in relevant part, that "[t]he findings of the Commissioner of Social security as to any fact, if supported by substantial evidence, shall be conclusive." The issue to be determined by this Court is whether the Commissioner's conclusions "are supported by substantial evidence in the record as a whole or are based on an erroneous legal standard." *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Substantial evidence is defined as "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

For purposes of the Social Security Act, disability is the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Schaal*, 134 F.3d at 501.

> The SSA has promulgated administrative regulations for determining when a claimant meets this definition. First, the SSA considers whether the claimant is currently engaged in substantial gainful employment. If not, then the SSA considers whether the claimant has a "severe impairment" that significantly limits the "ability to do basic work activities. If the claimant does suffer such an impairment, then the SSA determines whether this impairment is one of those listed in Appendix 1 of the regulations. If the claimant's impairment is one of those listed, the SSA will presume the claimant to be disabled. If the impairment is not so listed, then the SSA must determine whether the claimant possesses the "residual functional capacity" to perform his or her past relevant work. Finally, if the claimant is unable to perform his or her past relevant work, then the burden shifts to the SSA to prove that the claimant is capable of performing "any other work."

*Schaal*, 134 F.3d at 501 (Citations omitted).

THE ALJ'S DECISION

Applying the five-step sequential analysis discussed above, the ALJ found, first, that plaintiff had not engaged in substantial gainful activity during the relevant period. Second, he found that she had the following "severe" impairments: "fibromyalgia, irritable bowel syndrome, symptoms consistent with carpal tunnel syndrome, bilateral later epicondylitis [tennis elbow], cervical degenerative disc disease, and depression." Third, the ALJ found that plaintiff's severe impairments did not, either singly or in combination, meet or equal the criteria of any impairment(s) listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P ("the Listings")(20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925, and 416.926).

At the fourth step of the five-step analysis, the ALJ considered plaintiff's residual functional capacity. In arriving at a conclusion, the ALJ disregarded portions of the plaintiff's testimony as being not credible. In this regard, the ALJ began by stating that he would "consider all symptoms, including pain, and the extent to which these symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence based on the requirements of 20 C.F.R. § 404.1529, and Social Security Ruling 96-7p." (18) The ALJ went on to state that most of plaintiff's complaints of pain were not supported by objective medical findings. (18-19). The ALJ also indicated that plaintiff "has reported constant, debilitating pain, yet is not prescribed any pain medication." The ALJ concluded that plaintiff had "exaggerated her symptoms and limitations." The ALJ also essentially rejected Dickinson's opinion:

> The [ALJ] has considered the opinion of Dr. Dickinson that the claimant was unable to perform work-related activities but is unable to give it significant weight in this decision. Dr. Dickinson's opinion is not only

contrary to the opinions of Drs. Powers, Medalle, Pomponio and Knapp, but also the longitudinal record and the objective medical evidence of record.

(19). Having made these findings, the ALJ concluded that plaintiff had the residual functional capacity to perform "entry-level, unskilled, routine, repetitive, sedentary work; with an option to sit or stand; performing one to two step processes; doing posturals occasionally, primarily gross grasping, rather than fine manipulation." The ALJ consequently found that plaintiff could not perform her past relevant work.

At step five of the five-step analysis, the ALJ found, based upon the testimony of Andrews, the VE, that there were two jobs in the national economy which plaintiff could perform: "preparer" and "surveillance system monitor." In this regard, at the hearing, the following exchange took place between the ALJ and Andrews:

> [ALJ:] Please assume a younger individual with a high school education precluded from performing all but sedentary work with a sit/stand option. Primarily gross grasping, occasional postural that's unskilled and low stress. Defined as one and two-step processes with routine and repetitive tasks, primarily working with things rather than people. Entry level, sedentary, sit/stand, occasional postural, primarily gross grasping, low stress. With those limitations, Ms. Andrews, can you describe any work that this hypothetical individual can perform?
>
> [Andrews:] None of the past relevant work. There'd be a preparer position with a DOT code of 700.687-062 which is unskilled, sedentary position. National statistics that include 105,000 positions, regionally, 430. The regional is being denoted as the Finger Lakes region of New York which includes Genesee, Livingston, Monroe, Ontario, Orleans, Seneca, Chemung and Wyoming and Yates Counties as deemed by the New York State Department of Labor and ll the general statistics from the resource. It should be noted that the preparer position requires frequent handling but occasional fingering. Depending upon the gross grasping limitation with that frequent handling, that may fit within that hypothetical. But if it's only occasional grasping as being allowed, then, obviously that would no longer be viable. There'd be a surveillance system monitor with a DOT code of 379.367-010. Which is also being listed as an unskilled position with an SVP of 2, sedentary exertion. National statistics would include

188,540 positions and regionally, 533 positions.

(268). However, on cross-examination, Andrews testified that the statistics she used were obtained from the New York State Department of Labor and covered broad categories of jobs, including an unknown number of positions besides the preparer and surveillance system monitor positions. The ALJ nonetheless concluded that: 1) plaintiff was able to perform both the preparer and surveillance system monitor positions; 2) those positions existed in significant numbers in the economy; and 3) plaintiff was therefore not entitled to disability benefits.

## ISSUES PRESENTED

The issues presented in this case are: 1) Whether the Administrative Law Judge ("ALJ") properly evaluated plaintiff's credibility; 2) whether the ALJ properly determined plaintiff's residual functional capacity ("RFC") to perform work; and 3) whether, where the plaintiff was unable to perform her past relevant work, the ALJ properly found that plaintiff could still perform other jobs that exist in the economy.

## ANALYSIS

The Court will first consider the issue of plaintiff's credibility. ALJ's are required to evaluate a claimant's credibility according to the factors set forth in 20 C.F.R. § 404.1529, which states in relevant part:

> In determining whether you are disabled, we consider all your symptoms, including pain, and the extent to which your symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence. By objective medical evidence, we mean medical signs and laboratory findings as defined in § 404.1528 (b) and (c). By other evidence, we mean the kinds of evidence described in §§ 404.1512(b) (2) through (6) and 404.1513(b) (1), (4), and (5) and (e). These include statements or reports from you, your treating or examining physician or psychologist, and others about your medical history, diagnosis, prescribed

> treatment, daily activities, efforts to work, and any other evidence showing how your impairment(s) and any related symptoms affect your ability to work. We will consider all of your statements about your symptoms, such as pain, and any description you, your physician, your psychologist, or other persons may provide about how the symptoms affect your activities of daily living and your ability to work.

20 C.F.R. § 404.1529(a).

Here, in evaluating plaintiff's credibility, the ALJ stated that, "[t]he claimant has reported constant, debilitating pain, yet is **not** prescribed any pain medication." (19) (emphasis added). However, as discussed above, plaintiff had regularly been prescribed both Elavil and Celebrex (180).[3] In a case such as this, where the claimant's primary complaint is pain, the Court believes that this error alone might require reversal of the Commissioner's decision. However, the Court does not rely on this basis alone in finding that reversal is warranted. For example, the Court also finds that the ALJ's description of plaintiff's daily activities does not accurately reflect the record evidence. Specifically, the ALJ stated that plaintiff "is able to shop, drive, cook, clean, launder clothes, care for her child, wash dishes, read, watch television, listen to the radio and care for all of her personal needs," but failed to mention that plaintiff needed help with most of the household chores and performed activities such as driving only on limited

---

[3] At the time of the hearing, it appears that plaintiff stopped taking prescription medications besides Elavil. (255, 261). However, she testified that she was taking amitriptyline [Elavil], which is used both for the treatment of depression and chronic pain due to fibromyalgia. *See, e.g.*, "Useful Treatments for Fibromyalgia Syndrome," 3/1/05 AFAMPHYS 975, 2005 WLNR 7621897 ("Treatments for fibromyalgia syndrome with the strongest evidence for efficacy include amitriptyline [Elavil]").

basis.[4]  The ALJ also seems to have given improper weight to plaintiff's acknowledgment that she smoked marijuana and drank "eight or nine" beers a month as a basis for discrediting her testimony.  The Court does not see how plaintiff's moderate beer consumption affects her credibility.  Therefore, to the extent that the ALJ relied on that fact at all in finding plaintiff not credible, it was error.  As for plaintiff's marijuana use, the ALJ apparently believed that it contributed to plaintiff's depression, and therefore undermined her credibility. However, there is no medical evidence in the record to support that view.[5]  Seizing upon an apparent inconsistency in plaintiff's testimony, the ALJ also incorrectly stated that "testified that she was only able to sit up to 10 minutes continuously." (16; see also, 18).  However, plaintiff was not asked to specify how long she could sit continuously, rather, she was asked whether she had a limited ability to sit in general. (256).  Moreover, her answer is somewhat ambiguous, because she stated that while she was limited in her ability to sit, she was "not really too conscious of it" at home, because she did not usually sit for more than ten minutes at a time. (256).  On the other hand, the ALJ apparently gave no favorable consideration to

---

[4]While the ALJ noted, in one portion of his decision, that plaintiff "*reported* needing occasional assistance with some household chores," and that she "reported" driving only short distances (14), he did not refer to these limitations when he determined her RFC. (19).

[5] The ALJ wrote: "In 2002 the claimant reported smoking marijuana during her menstrual period [to relieve pain] for two years to Dr. Medalle.  According to the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, mild forms of depression, anxiety or irritability are seen in about one-third of individuals who used cannabis regularly."  The ALJ did not explain how the DSM manual defined the term "regularly."  In any event, since neither Dr. Medalle nor any of the other doctors involved in this case drew any connection between plaintiff's marijuana use and her depression, it was improper for the ALJ to do so. *See, Balsamo v. Chater*, 142 F.3d 75, 81 (2d Cir. 1998) ("[I]t is well-settled that the ALJ cannot arbitrarily substitute his own judgment for competent medical opinion.") (citation and internal quotation marks omitted).

plaintiff's 25-year work history in assessing her credibility. *See*, 20 CFR § 404.1529(c)(3) ("We will consider all of the evidence presented, including information about your prior work record.").

The ALJ's errors in assessing plaintiff's credibility are significant, since, as the ALJ stated, "In view of this determination concerning the claimant's credibility, the [ALJ] *does not accept* medical findings or opinions that are based solely or primarily on the claimant's *subjective complaints*." (19) (emphasis added). Since a diagnosis of fibromyalgia is based primarily, if not entirely, on subjective complaints of pain, the ALJ's statement indicates that he refused to accept the only medical evidence of plaintiff's condition that exists. *See, Rodriguez v. McGraw-Hill Companies, Inc.*, 297 F.Supp.2d 676, 678 (S.D.N.Y. 2004) ("[E]ven though no objective, specific diagnostic test for fibromyalgia has yet been developed, the widely-reported subjective symptoms-- such as the presence of widespread chronic pain present for at least three months in all four quadrants of the body and tender points present in at least eleven of eighteen predetermined body parts, provide sufficient criteria for diagnosing the condition and distinguishing it from other ailments. The bottom line is that experienced physicians do recognize fibromyalgia as a real entity.") (citations and internal quotation marks omitted).

Plaintiff further contends that the ALJ incorrectly determined her RFC. Clearly, the ALJ's erroneous credibility determination affected his findings as to plaintiff's RFC. In addition, however, plaintiff alleges that the ALJ did not adequately describe her exertional and non-exertional impairments. In that regard, as discussed above, the ALJ

13

found that "claimant retains the [RFC] to perform entry-level, unskilled, routine, repetitive, sedentary work; with an option to sit or stand; performing one to two step processes; doing posturals occasionally, primarily gross grasping, rather than fine manipulation." (19).  This generalized finding is not sufficient, particularly with regard to plaintiff's ability to sit, stand, and use her hands. *See, Ferraris v. Heckler*, 728 F.2d 582, 587 (2d Cir. 1984) ("On remand, the ALJ should make specific findings of exactly what [the claimant] can do, especially with reference to his ability to sit and for how long," and further noting that sedentary work generally involves sitting for at least six hours out of an eight-hour workday.).  Here, on remand, the ALJ should also clarify the weight that he gave to the opinions of the various medical providers.  For example, the ALJ essentially rejected the opinion of Dr. Dickinson as being inconsistent with all of the other medical evidence in the record. (19) ("Dr. Dickinson's opinion is not only contrary to the opinions of Drs. Powers, Medalle, Pomponio and Knapp, but also the longitudinal record and the objective medical evidence of record.").  However, the ALJ did not explain why he found Dickinson's opinions inconsistent.  For example, Dickinson's opinion is only inconsistent with Knapp's in one narrow respect, which is that Dickinson wrote that plaintiff had "possible carpal tunnel" (187), while Knapp stated that plaintiff did not have carpal tunnel syndrome. (167-68).[6]  Moreover, while Dickinson found plaintiff to be more limited in her abilities than Pomponio, Pomponio nonetheless stated that plaintiff was moderately limited in walking, standing, and sitting, and very limited in using her hands, lifting, carrying, pushing, and pulling. (145).  The ALJ is correct that

---

[6]Knapp did, however, find "a suggestion of a median nerve distribution of sensory loss, of mild degree in both hands." (167).

14

Dickinson's opinion appears contrary to that contained in Powers' March 2004 report, in which Powers states that plaintiff was "medically cleared for *any and all* employment." (182) (emphasis added). However, this March 2004 report by Powers appears inconsistent with his own prior diagnosis of fibromyalgia (128-29), and is also inconsistent with the opinions of Carlson[7], Medalle[8], Pomponio, and Dickinson. This is significant, because the ALJ relied heavily on Powers' March 30, 2004 note in evaluating plaintiff's RFC, referring to it on five separate occasions. (16-18). On remand, the ALJ should explain the weight that he is giving each medical opinion, and should attempt to develop the record further to determine why Powers' March 2004 note did not mention fibromyalgia.

Finally, plaintiff contends that the ALJ erred at the fifth step of the five-step disability analysis. At step five of the five-step analysis above, the defendant may carry its burden by resorting to the Medical Vocational Guidelines or "grids" found at 20 C.F.R. Pt. 404, Subpart P, Appendix 2. *Pratts v. Chater*, 94 F.3d 34, 38-39 (2d Cir. 1996)(citation omitted); *see also*, SSR 83-10 (Noting that in the grids, "the only impairment-caused limitations considered in each rule are exertional limitations.") However, if a claimant has nonexertional impairments which "significantly limit the range of work permitted by his exertional limitations," then defendant cannot rely upon the grids, and instead "must introduce the testimony of a vocational expert (or other similar

---

[7] Carlson stated that plaintiff "should avoid left hand and right hand forceful gripping" and "repetitive handwork." (134).

[8] Medalle stated that plaintiff was "mildly limited in performing sustained moderate-to-heavy physical exertion." (141).

evidence) that jobs exist in the economy which claimant can obtain or perform."[9] *Pratts v. Chater*, 94 F.3d at 39; *see also*, 20 C.F.R. § 416.969a(d).[10]

Plaintiff contends that the ALJ's hypothetical question to the VE was improper first of all because it did not accurately described plaintiff's exertional and non-exertional impairments.  Plaintiff also contends that the ALJ erroneously found that she had the ability to perform the "preparer" and "surveillance system monitor" positions, and failed to specify the number of such positions that exist in the local economy.  The Court agrees, in light of the errors identified above concerning plaintiff's RFC assessment, that the hypothetical was potentially incorrect insofar as it assumed that plaintiff was able to sit and/or stand long enough to perform sedentary work, and that she was able to use her hands repetitively.  For example, the VE testified that plaintiff would not be able to perform the preparer's job if she was limited to "occasional grasping" or was unable to perform "fine hand movements requiring fine gross dexterity." (267, 269).  The Court also agrees that the ALJ failed to establish the number of preparer and surveillance system monitor positions that exist in the local economy.  As discussed earlier, the numbers testified to by the VE pertained to broad

---

[9]"Exertional limitations" are those which affect an applicant's ability to meet the strength demands of jobs, such as sitting, standing, walking, lifting, carrying, pushing, and pulling.  "Non-exertional limitations" are those which affect an applicant's ability to meet job demands other than strength demands, such as anxiety, depression, inability to concentrate, inability to understand, inability to remember, inability to tolerate dust or fumes, as well as manipulative or postural limitations, such as the inability to reach, handle, stoop, climb, crawl, or crouch. 20 C.F.R. 416.969a.

[10]20 C.F.R. § 416.927(d) provides, in relevant part, that, "[w]hen the limitations and restrictions imposed by your impairment(s) and related symptoms, such as pain, affect your ability to meet both the strength [exertional] and demands of jobs other than the strength demands [nonexertional], we consider that you have a combination of exertional and nonexertional limitations or restrictions. . . . [W]e will not directly apply the rules in appendix 2 [the grids] unless there is a rule that directs a conclusion that you are disabled based upon your strength limitations; otherwise the rule provides a framework to guide our decision."

categories of jobs that included positions other than the preparer and surveillance system monitor positions, and the VE could not say how many preparer and surveillance system monitor positions existed.

## CONCLUSION

For all of the foregoing reasons, plaintiff's motion for judgment on the pleadings [#3] is granted, defendant's cross-motion for the same relief [#5] is denied, and this matter is remanded, pursuant to 42 U.S.C. § 405(g), sentence four, for a new hearing. The Clerk of the Court is directed to close this case.

So Ordered.

Dated: Rochester, New York
      July 8, 2005

ENTER:

/s/ Charles J. Siragusa
CHARLES J. SIRAGUSA
United States District Judge